[No. C046096. Third Dist. July 28, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTHUR DANIEL RUILOBA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 976.1, only the introductory paragraphs, Factual and Procedural Background, parts III and IV of the Discussion, and the Disposition of this opinion are certified for publication.

## COUNSEL

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, John G. McLean and George M. Hendrickson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORRISON, J.**—A jury convicted Arthur Daniel Ruiloba of three counts of lewd conduct with a child under 16 while he was at least 10 years older than the child. (Pen. Code, § 288, subd. (c)(1); further unspecified section references are to this code.) The trial court sent him to prison for four years four months, and defendant timely appealed.

Defendant contends: (1) A statute improperly revived time-barred charges; (2) no substantial evidence supports count III; (3) no substantial corroboration supports extending the statute of limitation; (4) the court should have bifurcated the trial on the statute of limitation; (5) the court misinstructed about uncharged conduct; (6) the court misinstructed on corroboration; (7) the court should have excluded evidence about child sexual abuse accommodation syndrome (CSAAS); (8) the sentence is based on facts not found true by the jury; and (9) certain fines were improper, a claim conceded by the Attorney General.

In the published portions of this opinion, we reject defendant's claim that he was entitled to a bifurcated trial on the statute of limitations, but we offer an instructional suggestion for future cases, and we reject his claim that there is insufficient corroboration of the victim's allegations. In the unpublished portion, we will correct the concededly improper fines and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A complaint filed July 18, 2002, charged numerous sexual offenses. The charges were amended over time, and at trial the operative pleading alleged lewd conduct with a child under 14 (§ 288, subd. (a)) (count I), continuous sexual abuse (§ 288.5) (count II), and lewd conduct with a child 14 or 15 (§ 288, subd. (c)(1)) (counts III–VI). The jury convicted defendant on counts III, IV and V (alleging defendant rubbed his penis against the victim's vagina or had her rub his penis), acquitted on count VI (intercourse) and deadlocked on counts I and II, which were dismissed.

The victim, J., was 26 at trial and had been "raised by" defendant, who married J.'s mother, Karen. J. knew defendant (Karen's stepbrother) all her life; he began dating Karen when J. was about seven or eight. He worked as a Santa Clara County deputy sheriff. The family moved to Placerville when J. was 10. Defendant had not married Karen yet, but was part of the family.

When J. was about 10, during the summer when it was hot, she was on the bed watching television with defendant when he turned on some pornography and asked J. if she liked it. She became aroused and rubbed her crotch on his leg, through their clothing; defendant "was kind of surprised, and I was embarrassed." She retracted a claim that defendant put his hand down her pants at this time.

J. did not often think about sexual acts with defendant "Because I didn't want to remember them." She had trouble pinning down specific dates, but she recalled several times when he would pay her to put sunscreen on his genitals. She also recalled times when "He wanted me to give him a squeeze, which meant that he would take my hand and squeeze his penis and testicles or whatever."

Once, J. performed oral sex on defendant in the car, and once (after her brother had moved out of the house in 1990) in a "loft area of the upstairs," in an incident where defendant "ejaculated all over my face." Many times during junior high and high school, about every other day, he would wrestle with her, "and spread open my legs and rub his penis on me," sometimes while she was dressed, but sometimes when he took her clothes off; he would pull down his pants and touch her with his bare skin on these occasions.

Defendant had J. sleep with him in junior high and high school and sometimes would put his finger in her vagina, which woke her up. "Usually he would have me rub his penis until he ejaculated because I wouldn't have sex with him." He had been asking her to have intercourse since she was 13:

"He kept telling me to try it because it is so wonderful." Finally, when she was 15 or 16, she relented and he put his penis in her vagina, but it hurt her and he stopped.

J. did not report the abuse because she feared the impact her revelation would have on the family and she wanted to forget what had happened. However, when she learned that a female cousin who had been living with the family had left the house abruptly, she became concerned and made a report. At trial the cousin testified as a defense witness that defendant never touched her improperly and she left the house for other reasons.

At the behest of law enforcement, J. made a recorded telephone call to defendant, from which a reasonable person could infer that defendant had had an intimate relationship with J. when she was a child. We give more details about this telephone call later in this opinion.

B., a friend of J.'s from junior high and high school, testified that when she was 17, she visited J.'s family after J. had left home to go to college. She and defendant began massaging each other's feet while watching a movie and defendant "pulled my shirt up and messed with my bra." "[I]t was in the way of the massage. And I felt as if he was trying to go down the sides of my rib cage, and I pressed my arms very tightly against my sides." Defendant asked if B. wanted to have an affair, stating that his wife wanted him to be happy. The import of this was arguably lessened by (1) B.'s testimony, corroborated by Karen and a female child, that massages were common at the household and often B. and J. would give defendant mutual foot massages while watching television; (2) B.'s testimony that defendant often massaged her *under her clothing*, "mostly lower back area, hips"; and (3) her employment in a topless bar.

The defense theory was that defendant and J. became lovers after J. turned 18, and she became vindictive when they broke up. In addition to pointing out inconsistencies in J.'s story over time, the defense pressed the fact that she denied using a certain endearment towards defendant after she became an adult, a denial refuted when defense counsel, in violation of discovery rules, produced a Valentine's Day card J. had sent defendant. The trial court instructed the jury to consider the discovery violation when it evaluated this evidence. (CALJIC No. 2.28.)

The jury deadlocked on counts alleging lewd conduct and continuous abuse when J. was under 14, convicted defendant of three counts of lewd conduct

when she was 14 to 15 years of age, and acquitted him of the lewd conduct count based on intercourse when she was 15. The mixed verdicts do not mean the jury disbelieved the victim. The acquittal was likely due to uncertainty about J.'s age at the time of intercourse; a reasonable doubt about whether she was 15 or 16 meant defendant was entitled to an acquittal, because at trial he was no longer charged with unlawful sexual intercourse (§ 261.5) but with lewd conduct with a child aged 14 or 15, (§ 288, subd. (c)) based on intercourse. The deadlock on the counts alleging conduct before J. was 14 may well have resulted because some jurors were not satisfied, under the statute-of-limitation instructions given, that the evidence clearly and convincingly corroborated sexual activity with J. before the age of 14. Therefore, contrary to an implication in defendant's brief, the mixed verdicts do not show that the jury viewed J.'s testimony with suspicion.

## DISCUSSION

## I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. Corroboration to Satisfy Statute of Limitation

■ The People had the burden to prove the charges were timely brought. (See *People v. Lopez* (1997) 52 Cal.App.4th 233, 244–245 [60 Cal.Rptr.2d 511].) Generally, the burden to show this is by a preponderance of the evidence. (*Id.* at p. 248.) However, section 803, subd. (g) (section 803(g)) partly sets out a different burden. In order to extend the statute of limitations for certain sexual offenses, section 803(g) requires, in part, "independent evidence that clearly and convincingly corroborates the victim's allegation." (§ 803, subd. (g)(2)(B).) Defendant argues no substantial clear and convincing corroboration was shown. We disagree.

Tracking section 803(g) and the pleadings, the trial court instructed that the jury had to make five findings to extend the statute of limitations. Four had to be proven by a preponderance of the evidence, viz.: (1) On April 2, 2002, J. reported to the authorities while under age 18; 2) a complaint was filed on July 18, 2002; 3) the crimes involved substantial sexual conduct (as defined); and 4) the normal statute of limitations had expired. Facts (2) and (4) were

---

* See footnote, *ante*, page 674.

stipulated, defendant effectively conceded fact (1) in argument, and fact (3) was disputed only in the sense that the defense was that no unlawful conduct took place.

For the fifth fact, the trial court instructed the jury that it had to find "independent evidence that clearly and convincingly corroborates the victim's allegation, not including the opinion of any mental health professional. [¶] Clear and convincing evidence of the corroboration means evidence of such convincing force that it demonstrates in contrast to the opposing evidence a high probability of the truth of the fact for which it is offered as proof. [¶] Such evidence requires a higher standard of proof than proof by a preponderance of the evidence. [¶] You should consider all of the evidence bearing upon every issue regardless of who produced it."

To answer a written jury question, the trial court later instructed, "The independent evidence must clearly and convincingly corroborate [J.'s] allegations of sexual abuse. The corroborating evidence must connect the defendant to the commission of the crimes charged in such a way to convince you that [J.] is telling the truth. It is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the crimes charged, or that it corroborate every fact to which [J.] testified."

■ In determining whether the record shows substantial evidence, defendant concedes we apply the normal substantial evidence standard of review, regardless of the burden of proof in the trial court. (See *Crail v. Blakely* (1973) 8 Cal.3d 744, 750 [106 Cal.Rptr. 187, 505 P.2d 1027]; *In re Maria S.* (2000) 82 Cal.App.4th 1032, 1039 [98 Cal.Rptr.2d 655].) Thus, we view the evidence in the light most favorable to the jury's findings. (*People v. Barnes* (1986) 42 Cal.3d 284, 303–304 [228 Cal.Rptr. 228, 721 P.2d 110].)

■ Evidence of uncharged sexual misconduct that is admissible under Evidence Code section 1108 may be used to corroborate a victim's allegation and thereby satisfy section 803(g). "Given the significant probative value of uncharged sexual misconduct in sex crimes cases, we find evidence of such can be used to corroborate a victim's allegation of sexual abuse under section 803(g). Of course, the precise probative value to be accorded this evidence will depend on various considerations, such as the frequency of the uncharged acts and their similarity and temporal proximity to the charged acts." (*People v. Yovanov* (1999) 69 Cal.App.4th 392, 404 [81 Cal.Rptr.2d 586] (*Yovanov*); see *People v. Mabini* (2001) 92 Cal.App.4th 654, 659 [112 Cal.Rptr.2d 159] (*Mabini*) [similar molestations against another child of

similar age as the victim].) This impliedly rejects defendant's suggestion that each specific act alleged against a defendant must be corroborated. ■ Section 803(g) partly requires "evidence that clearly and convincingly corroborates the victim's allegation." (§ 803, subd. (g)(2)(B).) The "victim's allegation" can, and often does, consist of a description of multiple instances of abuse, often spread over years of time in the case of resident child molesters, such as in this case. To the extent an uncharged act shows a defendant's *propensity* to commit sexual offenses against a child, that can corroborate *all of the charged offenses* even if it does not *particularly* corroborate any specific offense. (*Mabini, supra,* 92 Cal.App.4th at pp. 657–659; *Yovanov, supra,* 69 Cal.App.4th at pp. 404–405.) In some cases, particular corroboration may be shown, such as where the offenses reflect a distinctive method. (See Evid. Code, § 1101, subd. (b).) But the corroboration does not have to corroborate each allegation in the criminal pleading, only the "victim's allegation." (§ 803, subd. (g)(2)(B).) Evidence of a person's propensity to do what the victim has alleged corroborates the victim's allegation. (*Mabini, supra,* 92 Cal.App.4th at p. 659 ["such evidence, if credited by the trier of fact, may standing alone constitute independent evidence that clearly and convincingly corroborates the victim's allegation"].) Further, the corroboration does not have to be sufficient to support a *conviction.* (*People v. Zandrino* (2002) 100 Cal.App.4th 74, 85 [121 Cal.Rptr.2d 879].)

The People produced two types of corroborating evidence. First, B. testified that once when she was 17, defendant possibly tried to grope her during a massage, told B. his wife did not mind if he had sex with other people, and invited an affair. Second, J. made a recorded telephone call to defendant.

■ Only a small part of B.'s evidence was of substantial value. The sexual invitation was not necessarily criminal, or at least it is not clear a jury would have found it to be criminal within the narrow definitions provided by Evidence Code section 1108, given that the trial court failed to instruct the jury properly on that statute. That error is discussed further in part V, *post,* in the nonpublished portion of this opinion. In any event, in the context of a consensual massage between persons who regularly and openly engaged in such conduct, the vague description of a possible grope and the request for sex were not the sort of uncharged acts from which a reasonable jury could conclude defendant had a propensity towards sexual relations with *young* girls generally. (See *People v. Maurer* (1995) 32 Cal.App.4th 1121, 1131 [38 Cal.Rptr.2d 335] (*Maurer*) [because Maurer and minor "were confidants and

freely discussed sexual and nonsexual matters," his sexual comments did not clearly show child molestation under § 647.6, for purposes of determining instructional error prejudice].) Nor was the B. incident similar to the J. incidents. (See *Yovanov, supra,* 69 Cal.App.4th at p. 404 [value of uncharged act corroboration turns partly on its similarity to charges].) However, B. also testified that defendant admitted his wife allowed him to have sexual affairs. That corroborates part of the pretext call, as we describe in a moment.

In a motion to dismiss (§ 995) defendant argued the pretext call did not corroborate the charges by clear and convincing evidence because the conversation was not explicit enough to support any single act, far less "the number of counts charged in this case." He conceded the tape referred to "some sort of intimacy [which] occurred between these two," "some kind of certainly immoral relationship," but that it did not clearly indicate "that the occurrence was after [J.] was over age 14, or even over age 18." Defendant generally presses the same claims on appeal. But defendant fails in his duty, as the appellant, to provide an accurate description of the content of the call.

We have explained why the corroborating evidence did not need to support each claimed sexual offense. By means of quotations from the transcript of the telephone call used as a guide at trial we will show why a rational jury could conclude the call corroborated J.'s allegations. Although the transcript was not introduced as evidence, the parties assume it is accurate. So do we. (See *County of El Dorado v. Misura* (1995) 33 Cal.App.4th 73, 77 [38 Cal.Rptr.2d 908].)

Before setting out the quotations, we explain that "Bob," a person mentioned by J. during the pretext call, was identified by J. and by a peace officer at trial as a convicted child molester. Detective Strasser testified this person "was a family friend of theirs that had been previously convicted of child molestation" and Strasser and J. agreed that she would use "Bob" "to introduce this subject . . . because the crimes that [Bob] was convicted of were specifically child molestation and it was specifically what was going on with her." Detective Strasser's testimony defining the relevance of "Bob" was, of course, independent of J.'s allegations.

J. called defendant while he was at work and at one point he had to hang up and call her back. We will use "J" and "D" for convenience. Some of the ellipses are in the original and some we have added for clarity, but we have preserved the tenor of the transcript excerpts.

"[J]: . . . [R]emember we were talking about Bob [S.] the other night?

"[D]: Right.

"[J]: And . . . about like how people are going to jail for that kind of stuff and all that and . . . .

"[D]: Yeah.

"[J]: . . . and I'm having a really hard time with, with what happened between me and you and . . . .

"[D]: Well that doesn't have anything to do with that.

"[J]: Well why not though?

"[D]: Because it was, it was me and you and a whole lot of ah, love involved.

"[J]: Yeah.

"[D]: And that wasn't to do with me, you know, being a predator and taking advantage of you and holding you and scaring you . . . .

"[J]: Yeah.

"[D]: . . . and, you know, abusing you, you know what I mean."

If defendant had had an adult sexual relationship with J., the obvious distinction between him and "Bob" would be that J. had not been a minor. But instead, defendant explains the difference is that he loved J. and he is not a "predator."

"[J]: Well but what about, I mean . . . I was always under the impression though that, that any type of sexual relationship between an adult and a child would be inappropriate. But then you know, you always told me that, you know, me and you were different. That, that it was different then [*sic*] most situations because of that, but I, I don't . . . I'm just having . . . .

"[D]: Well there's a lot of confusion for me and you, I know that.

"[J]: Yeah.

"[D]: I mean I'd never ever picked . . . I, I mean I'd be perfectly blunt and blatant. You know, what I tell you is a profile on a predator is, they can't stop.

"[J]: Yeah.

"[D]: And I have had nothing before and nothing since.

"[J]: Yeah.

"[D]: And it's totally different in that regard, you know what I mean?

"[J]: Yeah.

"[D]: I mean obviously if I was, you know, looming over the next child or, or whatever something to that effect. You'd say hey, that's not good."

Defendant says he is not a predator because he can stop and "had nothing before and nothing since," which a rational jury could infer meant no sex with a child before or since, particularly given his claim that he was not "looming over the next child . . . ." Defendant posits that "child" can refer to an adult child or stepchild, and argues this passage referred to an adult sexual relationship, but that is not the only rational interpretation, nor even the most likely.

Later in the call, defendant explains that he discouraged his wife from having other "young ladies around" because "the last thing I want to ever [be] accused of is, is being a predator" but he again distinguished his relationship with J. because "it developed over time and, and over love."

When J. explained the relationship made her feel like she was hiding something from her mother, defendant said "Well I don't think . . . you can be closer to her by, by discussing that with her." He then explained that his wife allowed him to have relations with other women. After more discussion, the following took place:

"[J]: . . . I mean do you remember when I was trying to stop it and I said, you know, I said that that kind of sexual relationship was just not right because of what the Bible says. And you said that, that you thought that it was okay because of these scriptures and stuff like that. And, you know, I've always felt like I've done something wrong.

"[D]: Well that's . . . .

"[J]: . . . And I felt like you did something wrong too, because . . . I mean I didn't understand that my mom was consensual with things like that.

"[D]: Right, right.

"[J]: And, and you know I always thought that you were an ass, because I thought that you shouldn't have been cheating on my mom.

"[D]: Yes, and that's because I couldn't and I don't want to share with you the intricacies of what your mom's about.

"[J]: Um-hum.

"[D]: Because why would I . . . see if I was a predator I would use that. I'd say, well did you know your mom did this? And did you know your mom did that?

"[J]: Yeah.

"[D]: You know what I'm saying?

"[J]: Um-hum.

"[D]: But there was no reason for that, because I wasn't approaching you with a predator mode. I was approaching you with . . . well actually we were approaching each other with, the love. We, you know, you didn't put me there. I didn't put you there. And when we were there I think, I need to be honest with you, I don't know what would have happened if you weren't. Because there was no love there with your mom at the time.

"[J]: Um-hum.

"[D]: She wasn't giving it and I wasn't getting it. And I, and I was feeling very lonely. . . ."

From this passage, a rational jury could infer defendant turned to J. for sexual and emotional companionship when his relationship with his wife was empty. When J. then indicated she was having difficulties because of the relationship and spoke of seeing a counselor, defendant warned against it, stating that would "expose" the issue, and "the ramifications are life long." He also said it would hurt J.'s mother: "[T]he only thing that would cause terror in her heart and terror in her life is for you to expose that, because then she'd be thinking, you know, I failed my daughter." Defendant suggests on appeal that disclosure of an adult sexual relationship also would be damaging,

but the jury did not have to construe the call that way. Defendant spoke of not being a "predator" because he could stop himself and had not "had any" before or since J., and was not "looming over the next child[.]" In sum, a reasonable trier of fact could conclude that defendant and J. were discussing a sexual relationship between themselves during J.'s minority. Although they did not discuss particular acts or dates, the tenor is clear. The fact it corroborates *any* sexual acts corroborates all of J.'s allegations, because the call tended to prove his lewd disposition toward her in particular. (See *People v. Moon* (1985) 165 Cal.App.3d 1074, 1079 [212 Cal.Rptr. 101].)

We find substantial evidence in the record to corroborate J.'s allegations within the meaning of section 803(g).

## IV. Adjudicating the Statute of Limitation

■ The period to file an action in some sex cases may be extended by section 803(g), which partly provides:

"(1) Notwithstanding any other limitation of time described in this chapter, a criminal complaint may be filed within one year of the date of a report to a California law enforcement agency by a person of any age alleging that he or she, while under the age of 18 years, was the victim of a crime described in [various sections].

"(2) This subdivision applies only if both of the following occur:

"(A) The limitation period specified in Section 800 or 801 has expired.

"(B) The crime involved substantial sexual conduct, as described in subdivision (b) of Section 1203.055, excluding masturbation that is not mutual, and there is independent evidence that clearly and convincingly corroborates the victim's allegation. No evidence may be used to corroborate the victim's allegation that otherwise would be inadmissible during trial. Independent evidence does not include the opinions of mental health professionals."

The jury was instructed that the normal statute of limitations had expired and charges "were filed pursuant to" section 803(g), "which extends the normal applicable statute of limitations under specified circumstances. The statute of limitations is the period of time within which charges must be filed after crimes have been committed." Then the jury was instructed, "If you find the defendant guilty . . . of any of the counts . . . you must further determine as to each count in which you find guilt, whether the People have proved" five facts necessary to extend the statute of limitations. During deliberations

the jury asked in writing whether it could first decide the statute of limitations question and the trial court said no. The prosecutor pressed this point in closing argument. Thus, the jury had to find beyond a reasonable doubt that defendant molested J., and then determine whether or not he could be prosecuted.

Defendant raises claims about how the issue of the statute of limitations was litigated, contending that the trial court either had a duty to bifurcate the issue from the question of guilt or had discretion to bifurcate and abused that discretion.

Preliminarily, we observe that defendant concedes he did not move for bifurcation. Further, all of the instructions were jointly requested. However, he raises the common fallback argument that trial counsel's failure to seek bifurcation reflects incompetence of counsel. (Cf. *People v. Ladd* (1982) 129 Cal.App.3d 257, 261 [181 Cal.Rptr. 29].) We will review his claims on that basis.

Defendant asserts that the extension of the statute of limitation was a severable issue from the issue of guilt and therefore at a hypothetical bifurcated trial the victim's testimony would be inadmissible, thus leading to an abbreviated trial limited to corroborating evidence, thus imposing no undue burden on the courts or duplicative proceedings. He reaches this conclusion by the following chain of reasoning: (1) The part of the statute most likely to be litigated requires corroboration of a "victim's allegation" (§ 803, subd. (g)(2)(B)); (2) an allegation is a charge set forth in an accusatory pleading, not testimony; (3) the victim cannot corroborate his or her own allegation. From these premises he derives the conclusion that "the statute expressly precludes the testimony of the victim on the issue of corroboration/statute of limitations."

We agree with premises (1) and (3). Often, as in this case, the questions whether the statute of limitations has expired, when the victim reported the abuse, whether it involved substantial sexual conduct and when a complaint was filed are not seriously disputed, and the statute itself requires the corroboration to be independent of the victim. We disagree with premise (2) and defendant's conclusion.

First, an allegation *in a criminal pleading* is made by and in the name of the *People*. (See *People v. Black* (2003) 114 Cal.App.4th 830, 832–834 [7 Cal.Rptr.3d 902].) That is not the same as the "victim's allegation" referred to in section 803(g). Second, as the Attorney General points out, a jury would have no way of knowing what needed to be corroborated absent testimony by the victim. An accusatory pleading is not supposed to be larded with

evidentiary detail; its purpose is to provide the accused with reasonable notice of the charges. (*In re Hess* (1955) 45 Cal.2d 171, 174–175 [288 P.2d 5]; see § 952 [pleading may be in "ordinary and concise language without any technical averments or any allegations of matter not essential to be proved"]; see also § 951 [giving statutory form criminal pleading].)

For example, in this case count III alleged lewd conduct with a child aged 14 or 15 by a person more than 10 years older, in violation of section 288, subdivision (c), specifically that between August 21, 1991, and August 20, 1993, "defendant had victim rub his penis while they were in his car." Defendant interposed no demurrer based on defective pleading. (§ 1004, subd. 2.) Without any explanation from the victim of the details of this alleged crime, a jury's effort to find corroboration in the testimony of other witnesses would be futile. There is nothing in the language of section 803(g) which suggests an intention to radically change accepted criminal pleading practices. Therefore we reject defendant's view that a bifurcated trial on section 803(g) would be more streamlined or would not be largely duplicative.

■ Defendant also contends that a separate trial is required because section 803, subdivision (g)(2)(B) partly provides "No evidence may be used to corroborate the victim's allegation that otherwise would be inadmissible during trial." By its terms that language simply confirms that the corroboration must be admissible under otherwise applicable evidentiary rules. It does not explicitly or by implication provide for a separate trial on the issue of corroboration.

Defendant also relies on a generalized due process claim of unfairness absent bifurcation and invites us to exercise our inherent powers to create a rule of procedure mandating bifurcation, or at least declaring that trial courts have discretion to bifurcate in such cases.

■ "All courts have inherent powers which enable them to carry out their duties and ensure the orderly administration of justice. The inherent powers of courts are derived from article VI, section 1 of the California Constitution and are not dependent on statute. [Citations.] These powers entitle courts to ' ". . . adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council." [Citation.]' [Citation.] Thus, a trial court has the inherent authority to create a new form of procedure in a particular case, where justice demands it. [Citations.] ' "The . . . power arises from necessity where, in the absence of any previously established procedural rule, rights would be lost or the court would be unable to function." ' " (*In re Amber S.* (1993) 15 Cal.App.4th 1260, 1264 [19 Cal.Rptr.2d 404].)

By statute, "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044.) Under this statute trial courts have discretion to fashion procedural rules as justice dictates. (See *People v. Cline* (1998) 60 Cal.App.4th 1327, 1333–1334 [71 Cal.Rptr.2d 41].)

For example, in *People v. Calderon* (1994) 9 Cal.4th 69 [36 Cal.Rptr.2d 333, 885 P.2d 83] (*Calderon*), the California Supreme Court held that under section 1044 a trial court could, in some cases, bifurcate the issue of a prior conviction allegation. (9 Cal.4th at pp. 74–80 [disapproving *mandatory* bifurcation].) "Having a jury determine the truth of a prior conviction allegation at the same time it determines the defendant's guilt of the charged offense often poses a grave risk of prejudice. As this court has recognized: 'Evidence that involves crimes other than those for which a defendant is being tried is admitted only with caution, as there is the serious danger that the jury will conclude that defendant has a criminal disposition and thus probably committed the presently charged offense. [Citations.]' [¶] It is clear, therefore, that a trial court, through the exercise of its general powers under section 1044, *may* order that the determination of the truth of a prior conviction allegation be determined in a separate proceeding before the same jury, after the jury has returned a verdict of guilty of the charged offense. The more difficult question is under what circumstances, if any, *must* a trial court bifurcate the trial in this manner?" (*Id.* at p. 75.)

The court concluded a trial court does not abuse its discretion to conduct a unitary trial unless evidence of an alleged prior conviction during the trial of the "currently charged offense would pose a substantial risk of undue prejudice to the defendant." (*Calderon, supra,* 9 Cal.4th at p. 77.) In some cases, such as where the evidence about the prior conviction would be admitted on the issue of guilt on the substantive offense, or admitted to impeach the defendant, a unitary trial would not be prejudicial. (*Id.* at p. 78.) In other cases, the nature of the prior offense, as compared to the charged offense, may not be prejudicial. (See *id.* at p. 79.)

One factor the court relied on was that, except where the prior conviction would be admitted anyway in a unitary trial, presenting the issue of a prior conviction at the same time as the issues relating to the substantive charges does not advance judicial economy: There is little likelihood of overlapping evidence, and a bifurcated phase would not duplicate the evidence, instructions, and argument pertaining to the substantive criminal charges. (*Calderon, supra,* 9 Cal.4th at p. 77.) In contrast, as we have just explained, a bifurcated proceeding on corroboration under section 803(g) *would be duplicative.*

Under defendant's view, the corroboration phase would *precede* the jury's adjudication of the substantive offenses. Contrary to defendant's view, the victim's testimony would be admissible. Presumably, in a bifurcated proceeding, at the close of evidence the court would instruct the jury on the offenses, corroboration and all the many other instructions required in a criminal case, the parties would argue the evidence of corroboration and the jury would deliberate. True, if a jury found no corroboration, the case would be over. But if a jury found corroboration, the rest of the evidence would have to be presented, the jury would have to be fully reinstructed, the parties would give arguments, and the jury would then deliberate on the substantive offenses. In addition to the loss of judicial efficiency by this duplication, the process would be far more complicated than it needs to be. In short, bifurcation is not the answer to defendant's concerns.

But we agree with defendant that instructing the jury first to determine guilt and then and only then to determine whether the case may be prosecuted could present unnecessary risks. Some otherwise diligent jurors might feel pressured to be less than faithful as to the section 803(g) instructions, in order to avoid loosing a proven child molester on the public.

A better course would be to include the elements of section 803(g) into the definition of the crimes, as appropriate to the given case, *and not even tell the jury why those elements are present.* The jury's job is to find the facts, and the jury does not need to be told the legal consequences of its findings. The jury would make a unified finding on each count. That is, to convict a jury would be told it had to find the substantive elements of the charged crime have been proven beyond a reasonable doubt, and that the elements needed to trigger the extension of the statute of limitations have been proven by the applicable standards (preponderance of the evidence for the first four facts; clear and convincing for the fifth). This would be somewhat akin to a special verdict. In any event, there would be no need to refer to "statute of limitations." The jury need only be told to find the facts. In cases where some alleged acts may be barred and others could not be, (e.g., victim A's claims were reported immediately and charges brought, leading to victim B's older claims) a jury could be instructed on the substantive elements for counts X, Y and Z, and instructed that for counts A, B and C, there are the following additional elements, listing the section 803(g) facts.

We find support in the rule, as the jury was instructed in this case, providing that the jury should not "discuss or consider the subject of penalty or punishment." (CALJIC No. 17.42.) It is improper to tell a noncapital jury about possible punishment because that subject is not only irrelevant to the jury's factfinding function, it has the potential to deflect the jury by inviting

discussion and speculation about the results of whatever findings it makes. (*People v. Shannon* (1956) 147 Cal.App.2d 300, 306 [305 P.2d 101].) So, too, here: The jury's job was to find whether the facts necessary to trigger an extension of the statute of limitations existed (under the various applicable burdens of proof). Telling the jury that its findings on guilt (beyond a reasonable doubt) in effect would be set aside unless the jury also found the statute of limitations was extended carried the potential for irrelevant speculation and nullification. (See *People v. Nichols* (1997) 54 Cal.App.4th 21, 23–25 [62 Cal.Rptr.2d 433] [three strikes jury not to be told of sentencing consequences, lest it encourage nullification].) In a sense, telling the jury about the effect of its section 803(g) findings could have invited speculation about punishment, that is, *whether the defendant might escape all punishment.*

However, we agree with the Attorney General that this defendant is not entitled to a reversal. Defendant explicitly requested all of the instructions given. Trial counsel did not want the jury to "infer that the instruction package favors one side or the other;" the court clarified: "Sure. Are you requesting all those instructions as well? [¶] [Defense Counsel]: Yes." That was arguably a rational tactical decision, thereby inviting any error. (Cf. *Maurer, supra,* 32 Cal.App.4th at pp. 1127–1128.)

More importantly, the finding of corroboration—the only section 803(g) factor in real dispute—was largely supported by defendant's highly incriminating audiotaped admissions, which we set out in detail above. Even had the instructions been modified in the way we have proposed, there is no reasonable probability the jury would have returned different findings. There is nothing in this record to show this jury had difficulty following the instructions on this point, as clarified by the trial court's response to the jury's question. Therefore, defendant cannot establish that it is reasonably probable he would have obtained a better result in the absence of trial counsel's alleged incompetence in failing to seek bifurcation or requesting modification of the instructions to address the concerns now raised. (*Strickland v. Washington* (1984) 466 U.S. 668, 693–695 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217–218 [233 Cal.Rptr. 404, 729 P.2d 839].)

V.–IX.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 674.

## DISPOSITION

The judgment is modified by striking the section 1202.45 fine and reducing the section 290.3 fine to $100. The trial court is directed to prepare and forward to the Department of Corrections a new abstract of judgment. As so modified the judgment is affirmed.

Sims, Acting P. J., and Butz, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 2, 2005.